UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SECURITIES     AND     EXCHANGE
COMMISSION,

       Plaintiff,

v.                      Case No: 2:11-cv-116-FtM-29DNF

RADIUS  CAPITAL  CORP.  and
ROBERT A. DIGIORGIO,

       Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on Plaintiff's Motion for Entry of Final Judgment Imposing Monetary and Injunctive Relief (Doc. #335) filed on February 20, 2014. Plaintiff file a renewed motion seeking the same relief on November 3, 2014. (Doc. #368.) Defendant Robert A. DiGiorgio[1] filed Responses (Docs. ##349, 372) to both the initial and renewed motions on March 6, 2014 and January 15, 2015, respectively, and the Court heard oral argument on April 14, 2015. Following oral argument, Defendant Robert A. DiGiorgio filed an additional Response (Doc. #385) on April 15, 2015.[2] For the reasons set forth below, the motion is granted.

_____

[1] The Court notes that The Complaint for Injunctive and Other Relief (Doc. #1) was brought against Radius Capital Corp. and Robert A. DiGiorgio, and Mr. DiGiorgio spells his name with a space as Robert Di Giorgio. Consistent with the Complaint, the Court will continue to use DiGiorgio throughout the Opinion and Order and corresponding Injunction, however all findings and conclusions apply fully to Robert Di Giorgio.

[2] The April 15, 2015 Response was filed without leave of the Court,

**I.**

This case is a civil enforcement action brought by the Securities and Exchange Commission (the Commission or SEC) concerning fraud committed by Defendants Robert A. DiGiorgio (DiGiorgio) and Radius Capital Corp. (Radius) in connection with the offer and sale of mortgage-backed securities (MBS).  The basic underlying facts, as established by the SEC at trial, are as follows:

DiGiorgio was the founder of Radius and was its chief executive officer from 1996 to 2006.  Radius operated as a mortgage lender and issuer of MBS.  The Government National Mortgage Association (Ginnie Mae) is a corporation of the United States within the Department of Housing and Urban Development.  Ginnie Mae guarantees the payment of principal and interest on securities backed by home loans made by private lenders but insured by the Federal Housing Administration (FHA) or certain other federal agencies.  Ginnie Mae regulations required that guaranteed securities issued by Radius had to be backed only by loans that were or would be FHA insured.  Ginnie Mae guaranteed 15 Radius MBS, which were issued and sold between December 2005 and October 2006 and had a total principal amount of over $23 million.

---

in violation of M.D. Fl. R. 3.01(c).  Since the April 15, 2015 Response merely reiterates the arguments made by DiGiorgio at oral argument and in his previous responses, the Court will nonetheless consider it.

In order to obtain the Ginnie Mae guarantees, Radius falsely represented that the loans backing the 15 MBS were eligible for FHA insurance despite knowing that the majority of the loans did not and could not meet FHA requirements.  The mortgages backing Radius' MBS eventually fell into default and in October 2006 Radius defaulted on its pass-through payments to investors. Consequently, Ginnie Mae was forced to step in and pay the investors the pass-through payments, and pay off any defaulted loans.  As a result, Ginnie Mae suffered more than $5 million in losses.

The SEC brought an enforcement action against DiGiorgio and Radius alleging violations of the Securities Act of 1933 (the Securities Act), the Securities Exchange Act of 1934 (the Exchange Act), and Exchange Act Rule 10b-5.   (Doc. #1.)  DiGiorgio proceeded to trial, where the jury returned a verdict of liability on all claims asserted by the SEC.  Specifically, the jury found that DiGiorgio violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5. (Doc. #333.)

Radius did not answer the Complaint or otherwise participate in the litigation.  On March 25, 2014, the Court granted the SEC's motion for a default judgment against Radius for violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.  (Doc. #355.)  In that Order,

the Court explained that the SEC was entitled to disgorgement of ill-gotten gains, pre-judgment interest, civil penalties, and injunctive relief, with the specific form of that relief to be determined subsequently and in conjunction with the Court's determination of the appropriate relief against DiGiorgio. (Id.) That determination was deferred pending resolution of DiGiorgio's appeal to the Eleventh Circuit. (Doc. #366.)  On September 24, 2014, the Eleventh Circuit dismissed DiGiorgio's appeal for lack of jurisdiction. (Doc. #368-1.)  Accordingly, the Court may now address the proper relief against both DiGiorgio and Radius.

## II.

### A.  Injunction

The SEC seeks a permanent injunction barring DiGiorgio and Radius from violating the securities laws when dealing with MBS and from offering or selling MBS issued by Radius, DiGiorgio, or any entities either controls.  "The SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." SEC v. Calvo, 378 F.3d 1211, 1216 (11th Cir. 2004).  "Indicia that a wrong will be repeated include the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the

wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." Id. (quoting SEC v. Carriba Air, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982)).

To comport with the Federal Rules of Civil Procedure, an injunction must "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). However, recognizing that reliance on official statutory and regulatory language may be helpful in crafting an appropriately-specific injunction, the Eleventh Circuit has held that in the context of a SEC civil enforcement action "a broad, but properly drafted injunction, which largely uses the statutory or regulatory language may satisfy the specificity requirement of Rule 65(d) so long as it clearly lets the defendant know what he is ordered to do or not do." SEC v. Goble, 682 F.3d 934, 952 (11th Cir. 2012).

The SEC must establish a prima facie case of previous violations of federal securities laws. Calvo, 378 F.3d at 1216. The jury found DiGiorgio liable, and concluded that DiGiorgio acted knowingly or with severe recklessness when he engaged in a scheme to sell MBS under false pretenses. (Doc. #333.) While DiGiorgio maintains his innocence, the jury verdicts are amply supported by

the evidence.  Thus, the SEC has established previous violations of federal securities laws.

The second showing which must be made by the SEC is that there is a reasonable likelihood that the wrong will be repeated.  Calvo, 378 F.3d at 1216.  DiGiorgio argues that an injunction is inappropriate here because (1) he is not a repeat offender; (2) his conduct was not egregious; (3) he did not act with a high degree of scienter; and (4) future violations are unlikely because he has neither the desire nor the financial ability to return to the mortgage business.  The Court disagrees with each of these positions, and finds that the SEC has established strong indicia that the wrongs will be repeated if not enjoined.

The evidence at trial demonstrated that DiGiorgio's misconduct was not an isolated incident, but instead consisted of 15 separate MBS offerings over the course of nearly a year.  The violations were not technical in nature, but involved knowing and intentional falsehoods.  While DiGiorgio disagrees, the jury found and the Court would concur that his scienter was high given his hands-on approach to the activities involved in the 15 MBS.  It is clear that DiGiorgio does not accept or recognize the wrongness of his conduct.  For example, during oral argument and in his written responses to the SEC's motion, DiGiorgio downplayed his role in the Radius scheme, reiterated his belief that he has done nothing wrong, and placed blame on the government for the losses

it suffered.  (Doc. #349, p. 2; Doc. #372, pp. 27.)  Additionally, DiGiorgio testified that after twenty years in the business he is currently pursuing a career in the real estate industry, which would provide the opportunity for him to commit future violations similar to those at issue here.

While the Court recognizes that considerable time has passed since the Radius scheme, that DiGiorgio has declared that he will not commit any future securities violations, and that DiGiorgio's financial condition would render further violations difficult, the Court concludes that these mitigating factors are outweighed by the nature of DiGiorgio's misconduct and his refusal to fully recognize its wrongness.  At 52 years old, DiGiorgio clearly has the intellectual ability, stamina, and experience to involve himself in similar activities if not otherwise enjoined. Therefore, the Court finds that the SEC has demonstrated a reasonable likelihood that additional securities violations will be committed and, therefore, injunctive relief is appropriate. Additionally, the Court finds that the SEC's proposed injunction clearly sets forth the acts which DiGiorgio and Radius are ordered not to do.  Accordingly, it comports with Fed. R. Civ. P. 65(d) and, therefore, the Court will grant the injunctive relief requested by the SEC.

**B.    Disgorgement**

The SEC requests that DiGiorgio and Radius be held jointly and severally liable for disgorgement of $1,427,095.  DiGiorgio argues that, while he has no liability, the actual amount is far less.[3]

"The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." Calvo, 378 F.3d at 1217.  "[T]he SEC needs to produce only a reasonable approximation of the defendant's ill-gotten gains, and exactitude is not a requirement."  SEC v. Monterosso, 756 F.3d 1326, 1337 (11th Cir. 2014) (quotation omitted).  "Once the SEC has produced a reasonable approximation of the defendant's unlawfully acquired assets, the burden shifts to the defendant to demonstrate the SEC's estimate is not reasonable."  Id. Additionally, "[i]t is a well settled principle that joint and several liability is appropriate in securities laws cases where two or more individuals or entities have close relationships in engaging in illegal conduct."  Calvo, 378 F.3d at 1215.  Thus, when parties act in concert to violate securities law, each party is jointly and severally liable for disgorgement of ill-gotten

---

[3] DiGiorgio also argues that the amount he is required to disgorge should be reduced to account for the fact that he is unable to pay any disgorgement amount.  However, the law is clear that the Commission is entitled to disgorgement of all ill-gotten gains irrespective of a defendant's ability to pay.  SEC v. Warren, 534 F.3d 1368, 1370 (11th Cir. 2008).

gains even if a particular party did not receive the proceeds. Monterosso, 756 F.3d at 1337-38 ("[A] personal financial benefit is not a prerequisite for joint and several liability.") (quoting SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1098 (9th Cir. 2010)).

The SEC calculates DiGiorgio's and Radius's ill-gotten gains as follows: "$519,043 in origination fees, discount fees, underwriting fees, and other fees when the loans closed," plus "$182,025 in up-front mortgage insurance premiums that were never transmitted to FHA as required," plus "$726,025 in proceeds" from the sale of MBS backed by fraudulently-obtained Ginnie Mae guarantees, for a total of "at least $1,427,095 in ill-gotten gains as a result of their fraudulent scheme." (Doc. #335, pp. 4-5.) The Court will address each category in turn.

**(1)  Origination And Other Related Fees**

The SEC's expert reviewed the available documentation for 87 loans that were ultimately included in MBS issued by Radius and guaranteed by Ginnie Mae despite the fact that those loans were not eligible for FHA insurance.[4]  As demonstrated by the SEC at trial, Radius collected origination fees, discount fees,

---

[4] DiGiorgio argues in a general fashion that he should not be required to disgorge amounts related to loans that did in fact qualify for FHA insurance.  However, as the Commission limited its analysis to 87 uninsured loans, that argument is inapplicable here. It is likewise inapplicable to the mortgage insurance premiums discussed below.

underwriting fees, warehouse fees, and processing fees when those 87 loans closed. (Doc. #353-3; Tr. Ex. P-077; Doc. #342, pp. 71-74.) As calculated by the SEC's expert, the total amount of those fees was approximately $519,043. (Id.) The SEC argues that these fees are "fruit of the fraud" because DiGiorgio arranged for Radius to make those loans knowing that they would be falsely-described to Ginnie Maw as eligible for FHA insurance.

DiGiorgio does not dispute that Radius collected approximately $519,043 in fees for uninsured loans at the time of origination. Instead, he argues that the amount must be reduced because certain fees collected by Radius were passed through to third-parties and because Radius did not profit from discount fees.

Specifically, DiGiorgio argues that Radius disbursed $77,252.90 in underwriting, warehouse, and processing fees to a third-party warehouse bank. According to DiGiorgio, these amounts were not retained by Radius and, therefore, do not constitute ill-gotten gains. However, other than trial testimony in which a SEC witness acknowledged that it was *possible* that warehouse fees were passed through to a third-party bank, DiGiorgio does not point to any evidence that the specific fees at issue here *were* disbursed as he claims. Radius business records were not produced in discovery. Given the lack of documentary evidence on the topic, and the undisputed fact that Radius did collect the underwriting, warehouse, and processing fees at one point, the Court will not

reduce the calculation of ill-gotten gains by those amounts. <u>See</u> <u>Calvo</u>, 378 F.3d at 1217-18 ("[W]here a defendant's record-keeping or lack thereof has so obscured matters that calculation of the exact amount of illicit gains cannot be accomplished . . . it is well within the district court's discretion to rule that the amount of disgorgement will be the more readily measurable proceeds received from the unlawful transactions.").

Discount fees are amounts paid by borrowers to their mortgage lender (here, Radius) in order to obtain a reduced interest rate on their loans. DiGiorgio concedes that Radius collected discount fees, but argues that those fees do not constitute profit because Radius subsequently included the loans (with their reduced interest rates) in MBS sold for profit. Because the SEC also seeks to disgorge the MBS-related profit, DiGiorgio argues that including discount fees in the calculation of ill-gotten gains constitutes double-counting. However, the mere fact that Radius was able to sell loans for which discount fees were paid for an additional profit at a later date does not change the fact that Radius received those fees from borrowers at the time of origination. Accordingly, the Court concludes that discount fees collected by Radius are properly included in the calculation of Defendants' ill-gotten gains.

In sum, the Court is satisfied that $519,043 is a reasonable approximation of the ill-gotten gains Defendants received in the form of origination and other related fees for uninsured loans.

**(2)  Mortgage Insurance Premiums**

During the relevant period, Radius collected up-front mortgage insurance premiums which were required to be transferred to FHA.  According to the SEC and as explained at trial, Radius did not make the required transfers for 69% of the loans backing the MBS at issue in this case.  Of those loans, the SEC's expert reviewed the closing documents for the same 87 uninsured loans discussed above.  (Doc. #335-9; Tr. Ex. P-120; Doc. #342, pp. 74-76.)  According to the SEC's expert, the mortgage insurance premiums for those 87 loans totaled $182,025 impermissibly retained by Radius.  (Id.)  This assertion is buttressed by the testimony of Radius's office manager, who explained at trial that "it was Mr. DiGiorgio who decided whether the up-front mortgage insurance premium would actually be forwarded to FHA."  (Doc. #339, pp. 106-07.)

DiGiorgio states in conclusory fashion that Radius did not actually receive (and therefore could not retain) premiums for all of the 87 loans analyzed by the SEC.  He also claims that a portion of these premiums remained in Radius's accounts when Ginnie Mae succeeded to them in October 2006.  However, DiGiorgio has

provided no documentary evidence to support those assertions.[5] Absent credible evidence to the contrary, the Court is satisfied that $182,025 is a reasonable approximation of the ill-gotten gains Defendants received in the form of mortgage insurance premiums Radius failed to transfer to FHA.

**(3)  MBS Proceeds**

Ultimately, Radius bundled the loans it originated into MBS which were then sold to investors such as Wachovia Securities (Wachovia).  The MBS sold for more than the aggregate principal amount of the loans backing them.  According to Wachovia account statements compiled by the SEC and presented at trial, Radius sold nine MBS to Wachovia for $15,524,067, which was $726,025 above the aggregate principal amount of the underlying loans:

| Radius Pool Number | Issue Date | Pool Amount | Date Proceeds Received By Radius | Amount Received By Radius Including Accrued Interest | Amount Radius Received In Excess of Pool Amount |
|---|---|---|---|---|---|
| 599209 | 12/1/2005 | $1,106,687.00 | 12/28/2005 | $1,136,417.69 | $29,730.69 |
| 599210 | 12/1/2005 | $1,859,980.00 | 12/28/2005 | $1,961,310.16 | $101,330.16 |
| 599214 | 3/1/2006 | $1,564,662.00 | 3/28/2006 | $1,649,414.53 | $84,752.53 |

---

[5] At trial, DiGiorgio presented an email he sent to Ginnie Mae concerning one of the 87 loans analyzed by the Commission.  In that email, DiGiorgio states that "a check has been cut" to Ginnie Mae for the mortgage insurance premium for that loan.  (Doc. #338, pp. 120-24; Tr. Ex. D-QQQ.)  However, DiGiorgio provided no evidence that Ginnie Mae ever received the check and the Commission's expert found no such evidence during her review of the relevant files.  (Id.)  At oral argument, DiGiorgio discussed similar evidence concerning a loan belonging to a Mr. Russell. However, that loan is not among the 87 loans for which the Commission seeks disgorgement.  (Doc. #335-9; Tr. Ex. P-120.)

| 599216 | 5/1/2006 | $1,407,083.00 | 5/18/2006 | $1,467,983.31 | $60,900.31 |
| 599218 | 7/1/2006 | $1,964,031.00 | 7/25/2006 | $2,060,432.19 | $96,401.19 |
| 599220 | 8/1/2006 | $1,887,127.00 | 8/22/2006 | $1,983,042.85 | $95,915.85 |
| 599221 | 9/1/2006 | $1,200,138.00 | 9/6/2006 | $1,238,104.86 | $37,966.86 |
| 599222 | 9/1/2006 | $1,829,908.00 | 9/19/2006 | $1,921,695.68 | $91,787.68 |
| 599223 | 10/1/2006 | $2,704,451.00 | 10/5/2006 | $2,831,691.67 | $127,240.67 |
| TOTAL | | $15,524,067.00 | | $16,250,092.94 | $726,025.94 |

(Doc. #335-11; Tr. Ex. P-097.)   The SEC contends that this $726,025 constitutes ill-gotten gains because the sales price was inflated as a result of fraudulently-obtained Ginnie Mae guarantees.

DiGiorgio does not dispute the SEC's calculations.   However, he does dispute that the entirety of the $726,025 difference between the sales price and the aggregate amount of the underlying loans constitutes ill-gotten gains.   According to DiGiorgio, this amount must be reduced to account for the fact that Radius "had to pay a deposit for each loan pool funded."   (Doc. #372, p. 18.) However, DiGiorgio has not provided any documentary evidence concerning the amounts of these deposits.   Additionally, DiGiorgio argues that the SEC failed to take into account that the nine MBS at issue contained some loans which were in fact eligible for FHA insurance.   While DiGiorgio is correct that not all of the underlying loans were ineligible, this does not impact the calculation of his and Radius's ill-gotten gains because the sales prices for the MBS were premised upon Ginnie Mae's guarantees, which could only be obtained if _all_ of the underlying loans were eligible for FHA insurance.

DiGiorgio also argues that the SEC's calculation of his ill-gotten gains from the sale of MBS must be adjusted to account for the fact that "Radius paid its reps 80% commission" to originate the loans that were ultimately included in the MBS.  (Doc. #349, p. 18.)  "[T]he power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing."  SEC v. ETS Payphones, Inc., 408 F.3d 727, 735 (11th Cir. 2005) (quotation omitted).  However, "how a defendant chooses to spend his ill-gotten gains, whether it be for business expenses, personal use, or otherwise, is immaterial to disgorgement."  SEC v. Aerokinetic Energy Corp., 444 F. App'x 382, 385 (11th Cir. 2011) (quotation omitted).  Accordingly, "the overwhelming weight of authority holds that securities law violators may not offset their disgorgement liability with business expenses."  SEC v. Merch. Capital, LLC, 486 F. App'x 93, 96 (11th Cir. 2012) (quoting SEC v. Brown, 658 F.3d 858, 861 (8th Cir. 2011)).  Here, the Court sees no reason to break with "the overwhelming weight of authority" and allow DiGiorgio to deduct his claimed legitimate business expenses.  Moreover, other than DiGiorgio's conclusory assertions, he has provided no evidence that Radius paid such commissions.

Finally, DiGiorgio argues that disgorgement related to the sale of MBS prior to March 2006 is barred by the five-year statute of limitations.  However, while the limitations period is relevant to the Court's calculation of Defendants' civil penalties, it has

no bearing on the amount of disgorgement.  See Calvo, 378 F.3d at 1218.

In sum, the Court is satisfied that $726,025 is a reasonable approximation of the ill-gotten gains Defendants received from the sale of nine MBS to Wachovia.  Accordingly, the Court finds that the SEC is entitled to disgorgement from DiGiorgio and Radius, jointly and severally, in the amount of $1,427,095, consisting of $519,043 of origination fees for 87 uninsured loans, $182,025 of impermissibly-retained mortgage insurance premiums for 87 uninsured loans, and $726,025 of MBS sales proceeds.

## C.   Prejudgment Interest

The SEC also requests an award of prejudgment interest on the disgorgement amount.  DiGiorgio does not contest the SEC's request, other than by asserting that no disgorgement should be ordered and therefore he should pay no interest.  The decision to grant prejudgment interest, as well as the rate at which interest is awarded, are within the discretion of the district court.  SEC v. Carrillo, 325 F.3d 1268, 1273 (11th Cir. 2003).  The purpose of prejudgment interest is "to divest those found liable under the securities laws of any benefit accrued from the use of the ill-gotten gain."  SEC v. Yun, 148 F. Supp. 2d 1287, 1293 (M.D. Fla. 2001), aff'd in part and vacated in part on other grounds, 327 F.3d 1263.  Courts routinely use the IRS underpayment rate when calculating prejudgment interest in SEC enforcement actions

because "[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996); see also SEC v. Lauer, 478 F. App'x 550, 558 (11th Cir.) ("[T]he district court did not abuse its discretion by applying the commonly-used IRS underpayment rate."), cert. denied, 133 S. Ct. 545 (2012).

The Court concludes that an award of prejudgment interest calculated pursuant to the IRS underpayment rate is appropriate in this case. Prejudgment interest shall run from November 1, 2006 (the first month following the conclusion of the Radius scheme) through the date Final Judgment is entered pursuant to this Opinion and Order.

**D.   Civil Penalty**

"Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." Monterosso, 756 F.3d at 1338. Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act authorize three tiers of civil monetary penalties against violators of the Acts. 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d). The first tier applies to any violation of the Acts. Id. The second tier applies to violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."

<u>Id.</u>  The third tier applies to any violation satisfying the second-tier criteria that also "resulted in substantial losses or created a significant risk of substantial losses to other persons."  <u>Id.</u>

The amount of the civil penalty is determined by the district judge "in light of the facts and circumstances" and subject to statutorily-prescribed amounts.  15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d).  For the time period at issue here, the statutory penalties applicable to an individual are:  $6,500 for each first tier violation; $65,000 for each second tier violation; and $130,000 for each third tier violation.  17 C.F.R. § 201.1003, Tbl. III.  For a legal entity, the applicable statutory penalties are: $65,000 for each Tier I violation; $325,000 for each Tier II violation, and $650,000 for each Tier III violation.  <u>Id.</u> However, the Court may exceed the statutory penalties and impose a civil penalty in an amount up to and including the "gross amount of pecuniary gain to the defendant as a result of the violation." 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d).  In evaluating the facts and circumstances of the case, the Court looks to factors such as:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing, (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons, (6) defendants' lack of cooperation and honesty with authorities, if any, and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

SEC v. Aerokinetic Energy Corp., No. 08-CV-1409, 2010 WL 5174509, at *5 (M.D. Fla. Dec. 15, 2010) (quotation omitted), aff'd, 444 F. App'x 382 (11th Cir. 2011).

Here, the jury found that DiGiorgio violated three provisions of Section 17(a) of the Securities Act and three provisions of Rule 10(b)-5. For four of these six violations, the jury found that DiGiorgio acted "knowingly" or with "severe recklessness." (Doc. #333.)   Thus, for those four violations, Defendants are subject to either a second or third tier penalty depending upon whether the scheme resulted in, or created a significant risk of, substantial losses to other persons.   15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d).   While the Acts do not define the term "substantial loss," the prevailing view in this District is that the approximately $5 million loss in this case is sufficiently substantial to subject Defendants to third tier penalties.   SEC v. Aleksey, No. 07-CV-159, 2007 WL 1789113, at *2 (M.D. Fla. June 19, 2007) ($82,960.18 was a substantial loss); Aerokinetic, 2010 WL 5174514, at *7 ($500,000 was a substantial loss); SEC v. Simmons, No. 04-CV-2477, 2008 WL 7935266, at *20 (M.D. Fla. Apr. 25, 2008) ($1,144,583.95 was a substantial loss).   Accordingly, the imposition of a third tier penalty against DiGiorgio and Radius for each of the four violations is appropriate.   The corresponding statutory penalty for each violation is $130,000 for DiGiorgio and $650,000 for Radius.

The jury also found that DiGiorgio, acting negligently, violated two provisions of Section 17(a) of the Securities Act. Id. These violations qualify for Tier I penalties, with a maximum per-violation penalty of $6,500 for DiGiorgio and $65,000 for Radius. In total, the maximum statutory penalties are $533,000 for DiGiorgio ([$130,000 x 4] + [$6,500 x 2]) and $2,730,000 for Radius ([$650,000 x 4] + [$65,000 x 2]). However, for DiGiorgio, the Court is permitted to asses a civil penalty up to and including his $1,427,095 pecuniary gain. DiGiorgio argues that the Court should refrain from issuing a large civil penalty because his financial situation is such that he is unable to pay _any_ civil penalty, no matter the amount. Although DiGiorgio's financial situation is relevant, "[a]t most, ability to pay is one factor to be considered in imposing a penalty," and "nothing in the securities laws expressly prohibits a court from imposing penalties or disgorgement liability in excess of a violator's ability to pay." SEC v. Warren, 534 F.3d 1368, 1370 (11th Cir. 2008).

As set forth above, DiGiorgio and Radius made repeated misrepresentations to mortgage borrowers and Ginnie Mae over the course of a year-long scheme involving 15 MBS offerings. As a result, DiGiorgio and Radius obtained a pecuniary gain of $1,427,095 and caused more than $5 million in government losses. In doing so, DiGiorgio acted with a high degree of scienter, and

does not appear to have accepted the wrongness of his conduct. Accordingly, the Court finds that a civil penalty in the amount of Defendants' pecuniary gain is appropriate in this case.

Defendants' pecuniary gain totaled $1,427,095. However, as detailed in the Court's July 15, 2013 Opinion and Order (Doc. #239), the SEC is barred from seeking civil penalties for MBS issued prior to March 7, 2006 because those transactions occurred outside the applicable five-year statute of limitations. See also Gabelli v. SEC, 133 S. Ct. 1216, 1220-21 (2013). As a result, the Court cannot consider the proceeds Defendants obtained from the sale of two MBS sold by Radius to Wachovia in December 2005.[6] Defendants' proceeds from those two sales were $131,060.85. (Doc. #335-11.) Subtracting that amount from Defendants' $1,427,095 pecuniary gain, the Court will assess a civil penalty against each Defendant jointly and severally in the amount of $1,296,034.15.

Accordingly, it is hereby

**ORDERED:**

---

[6] DiGiorgio argues that the MBS identified as Pool Number 599214 is also outside the five-year limitations period. While the official issue date for that security is March 1, 2006 (which is outside the limitations period), the Commission demonstrated at trial that MBS issue dates represent the first day of the month in which the MBS was issued irrespective of the date the transaction actually closed. As to Pool Number 599214, the Commission demonstrated that Radius did not seek Ginnie Mae's guarantee of that MBS until March 24, 2006, thereby placing Pool Number 599214 within the five-year limitations period. (Doc. #368-4.)

Plaintiff's Motion for Entry of Final Judgment Imposing Monetary and Injunctive Relief Against Robert A. DiGiorgio and Radius Capital Corp. (Doc. #335) is **GRANTED.** Judgment is entered in favor of Plaintiff and against Defendants Robert A. DiGiorgio and Radius Capital Corp. as follows:

1.    An injunction will be entered as follows:

     a)    Defendants Robert A. DiGiorgio (DiGiorgio) and Radius Capital Corp. (Radius) and Defendants' agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (Securities Act), 15 U.S.C. § 77q(a), in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

        1)    to employ any device, scheme, or artifice to defraud;

        2)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements  made, in light of the circumstances under which they were made, not misleading; or

        3)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser

     by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about any investment in or offering of mortgage-backed securities.

b)   Defendants and Defendants' agents, servants,
     employees, attorneys, and all persons in active
     concert or participation with them who receive actual
     notice of this Final Judgment by personal service or
     otherwise are permanently restrained and enjoined
     from violating, directly or indirectly, Section 10(b)
     of the Securities Exchange Act of 1934 (the Exchange
     Act), 15 U.S.C. § 78j(b) and Exchange Act Rule 10b-5,
     17 C.F.R. § 240.10b-5, by using any means or
     instrumentality of interstate commerce, or of the
     mails, or of any facility of any national securities
     exchange, in connection with the purchase or sale of
     any security:

     1)   to employ any device, scheme, or artifice to
          defraud;

     2)   to make any untrue statement of a material fact,
          or to omit to state a material fact necessary in
          order to make the statements made, in the light
          of the circumstances under which they were made,
          not misleading; or

     3)   to engage in any act, practice, or course of
          business which operates or would operate as a
          fraud or deceit upon any person

     by, directly or indirectly, (i) creating a false
     appearance or otherwise deceiving any person, or (ii)
     disseminating false or misleading documents,
     materials, or information or making, either orally or
     in writing, any false or misleading statement in any
     communication with any investor or prospective
     investor, about any investment in or offering of
     mortgage-backed securities.

c)   Defendants and Defendants' agents, servants,
     employees, attorneys, and all persons in active
     concert or participation with them who receive actual
     notice of this Final Judgment by personal service or
     otherwise are permanently restrained and enjoined
     from participating in the offer or sale of any
     mortgage-backed security issued by Radius or by any
     entity directly or indirectly owned or controlled by
     Radius or DiGiorgio.

2.   Defendants are jointly and severally liable for disgorgement
     of $1,427,095, representing the profits obtained as a result

of their violations; plus prejudgment interest calculated from November 1, 2006 to the date of this Final Judgment, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2); plus a civil penalty in the amount of $1,296,034.15 pursuant to Section 20 (d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(A). Defendants shall satisfy this joint and several obligation by paying all amounts ordered to the Securities and Exchange Commission (Commission) within 14 days after entry of this Final Judgment.

a)  Defendants may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendants may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to Enterprise Services Center, Accounts Receivable Branch, 6500 South MacArthur Boulevard, Oklahoma City, OK 73169 and shall be accompanied by a letter identifying the case title; civil action number, and name of this Court; Defendants by name; and specifying that payment is made pursuant to this Final Judgment.

b)  Defendants shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendants relinquish all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendants. The Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury. The Commission may enforce this judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after 14 days following entry of this Final Judgment. Defendants shall pay postjudgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

3.  The Court will retain jurisdiction over the enforcement of

the judgment upon entry.

The Clerk shall enter judgment in favor of the Commission and against Defendant Robert A. DiGiorgio as set forth herein.  The Clerk shall also enter judgment in favor of the Commission and against Defendant Radius Capital Corp. as set forth herein and as set forth in the Court's March 25, 2015 Opinion and Order (Doc. #355).

**DONE and ORDERED** at Fort Myers, Florida, this __20th__ day of April, 2015.

_____
JOHN E. STEELE
UNITED STATES DISTRICT JUDGE


Copies:
Counsel of Record